**In re BLOCK K ASSOCIATES, a Colorado limited partnership, EIN: 84–0871551, Debtor.**

**Bankruptcy No. 85 B 03395 J.**

United States Bankruptcy Court, D. Colorado.

Dec. 11, 1985.

Kenneth B. Siegel and James B. Holden of Sherman & Howard, Denver, Colo., for debtor.

Frances A. Koncilja and Arthur J. Bronson of Morrison & Foerster, Denver, Colo., for Crocker Nat. Bank.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THIS MATTER came on for hearing on the Motion for Dismissal or Conversion filed by Crocker National Bank ("Crocker").

The Debtor, a Colorado limited partnership, filed its voluntary Chapter 11 Petition on June 18, 1985. The Debtor, Block K Associates ("K") has one general partner, RTCK Associates ("RTCK") and one limited partner, TCD South, Inc. RTCK is in turn a limited partnership composed of Mr. Jay Roulier as the general partner and various Roulier family trusts as limited partners. TCD South, Inc. is one of a family of subsidiary organizations under the umbrella of a British company known as European Ferries (including TCD South, Inc.; TCD North, Inc., Geralnes B.V., Nanikin Investments, B.V. and Dolbos B.V., all three of which are Netherlands corporations) which own undeveloped land southeast of Denver known as the Denver Tech Center ("DTC"). For this opinion, this family will be referred to as "DTC".

"K" was formed in 1980 to purchase and develop 25.238 acres in an area known as superblock "K" of the Center ("Block K"). At the same time Mr. Roulier and TCD South, Inc. formed an identical partnership known as Block L Associates ("L") with Roulier as general partner of RTCL, RTCL as the general partner of "L" and TCD South, Inc. as the limited partner of "L". "L" was formed to acquire and develop an adjacent parcel of 17 acres of land in superblock "L" of the Center ("Block L"). The intent was to develop both parcels as one unit in phases. There is no question but that Roulier owns (personally or through his family trusts) RTCK, RTCL, "K", and "L".

The parcel in superblock K was acquired in 1981 and RTCK contributed but $200.00 in capital to "K" as did DTC. The Debtor paid $4,000,000.00 for the property which was 100% financed with a loan from Crocker. That loan was for $6,000,000.00 and the extra $2,000,000.00 was built in to pay the interest and charges during the two years of the loan. The loan was secured by a Deed of Trust on the property.

Development was to begin on Block L, and it was intended, although no document shows it, that as Block L was developed and sold, at least a portion of the proceeds would be used to support Block K, including retirement of Crocker's loan. But Block L was only partially developed, and eventually the Crocker loan became overdue on April 1, 1983. For a time DTC contributed approximately $667,000.00. But even the interest payments stopped in October, 1984. No payments have been made to Crocker since and the total principal and interest due to date is approximately $6,280,000.00 with interest accruing at $2,250.00 per day.

According to the partnership agreement (Exhibit 10) in § 2.03 RTCK (Roulier) was

required to make loans to the Debtor in whatever amounts were necessary to satisfy the Debtor's obligations and DTC, apparently relying on that section refused to advance further funds to pay Crocker. RTCK has likewise not advanced such funds.

In March, 1985, Roulier did obtain a loan commitment from Resource Savings Association for $9,400,000.00 (Exhibit B) which was to be used to pay off Crocker. However, DTC, which holds a veto power on such loans to the Debtor, refused its approval on several grounds, one of which being that it had no way of certifying the financial inability of the Debtor.

Roulier and his various entities are involved in state court litigation with DTC. (Exhibits 9 & 14). DTC entities are plaintiffs suing RTCK, RTCL and Roulier for themselves and on behalf of the Debtor, and, indeed requested that a receiver be appointed for the Debtor. Roulier's Answer asserts the affirmative defense that a receiver cannot be appointed because of the intervening bankruptcy petition filed by the Debtor. Yet in the face of these pleadings, counsel for Roulier asserts that this bankruptcy is in no way delaying, impeding or otherwise influencing that state court litigation. Perhaps counsel have not read the pleadings or were hoping that the Court would not. In addition, Roulier has counterclaimed and filed a third-party complaint against other DTC family members. The one common element through all this is the Debtor and the property it holds. In the meantime, Crocker is forced to sit on a $6,000,000.00 loan that was due over 2½ years ago, and is not collecting any interest.

Crocker commenced foreclosure proceedings in April, 1985, and a foreclosure sale was scheduled for June 19, 1985. As stated earlier, the Chapter 11 Petition was filed on June 18, 1985. On September 6, 1985, Crocker filed the within Motion. On October 16, 1985, the Debtor filed its Plan of Reorganization. The Plan is a plan of liquidation in two phases. Phase one calls for the sale of a part of the property within

one year for a 400,000 square feet hotel and a 300,000 square feet retail mall. Roulier expects the net proceeds from Phase one to be sufficient to pay all debts of the Debtor. Phase two calls for the sale of the remaining property within the next following year.

One of the buildings constructed on Block L is an office building. In late 1983, "L", as landlord, executed two leases to "K" for space in that building totaling 5,615 square feet for a total monthly rental of $10,293.16. Why this was done is not clear because "K" does not, and never did have, any employees of any kind. The leases were to run from October 1, 1984, for three years. The building was subsequently sold to Travelers Insurance Company ("Travelers") which became the landlord. The Debtor only paid one month's rent. After the bankruptcy was filed, Travelers filed a Motion for Relief from Stay and a Motion to Compel the Debtor to assume or reject the leases. The parties later stipulated that the leases were rejected and that Travelers would be entitled to an unsecured rent claim of $90,654.29, an administrative priority claim of $10,293.16, and an unsecured claim for damages of $92,638.44. There is a dispute as to whether or not it was subsequently necessary for Travelers to enlist the aid of the local sheriff to evict "K" from the premises.

The Debtor lists two secured creditors: Crocker and C.W. Fentress & Associates who claim a mechanics lien on the sole asset, *i.e.*, the Block K vacant property. TCD South has subsequently purchased the Fentress lien.

Unsecured debts are as follows:

| | |
|---|---|
| Architectural Control Committee | $ 784.50 |
| Block L Associates | 665,000.00 |
| DTC Maintenance | 3,134.50 |
| KKBNA (engineering services) | 2,175.98 |
| TCD North | 667,077.45 |
| Travelers Insurance (as stated *supra*) | 193,947.04 |
| Viscom Architectural | 252.00 |
| European Ferries plc | unknown |

When Travelers purchased the building in Block L, European Ferries guaranteed to

Travelers a minimum rental income. The reason the debt from "K" to European Ferries is listed as unknown is because some or all of the rent owing to Travelers has been indirectly guaranteed by European Ferries.

Thus, if you eliminate the outstanding secured and unsecured debt owing to entities related to either the Debtor or the DTC, there is a total of $7,346.48 unsecured and the debt to Crocker.

Much of the evidence at the hearing herein concerned the fair market value of the Debtor's property. Roulier, in the Debtor's petition, and in testimony before this Court asserted a value of $50,000,-000.00. Crocker's expert opined the value to be $9,000,000.00. The Debtor's own expert testified that the value is $22,901,-000.00. Much of the disagreement arises because (1) a dispute in litigation between DTC and the local municipality over the density to be allowed; and (2) another dispute between Roulier and DTC over that same density issue.

Crocker asks that the case be dismissed alleging that it was filed in bad faith. Any Court has the inherent authority and duty to inquire into the good faith of one seeking to invoke its jurisdiction. Unfortunately, it seems that both federal and state courts have shirked that duty in recent years and this has partially contributed to the overcrowding of court dockets resulting in delayed or denied justice to those truly entitled to use these forums. Bankruptcy courts are no exception. However, some of these courts have at least considered the issue recently and have set forth some standards by which the good faith of a Debtor can be judged.

In determining whether a petition has been filed in bad faith, the Court must examine all the facts and circumstances of the case. *Matter of Herndon Executive Center, Inc.*, 36 B.R. 803 (Bankr.M.D.Fla. 1984). Just as in an inquiry into the bad faith of a Chapter 13 debtor, no one factor should be controlling, and the weight given to each factor will vary with the facts and circumstances of each case. *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983).

The three main factors bankruptcy courts have considered are: (1) the timing of the filing of the petition; (2) the motive of the debtor in filing the petition; and (3) the accuracies or inaccuracies of the Debtors assertions in its petition and schedules.

The petition was filed one day before a foreclosure sale and just two weeks after Roulier and DTC filed their lawsuit against each other in state court. The foreclosure sale was no surprise. The loan had been overdue for two years, no interest had been paid for six months prior to Crocker initiating its foreclosure proceedings in April, 1985, and it was two months from the start of that procedure to the date set for the sale. Other than the eleventh hour effort of Roulier to obtain re-financing from Resource Savings Association in March, 1985, there is no evidence that anything was done to bring the Debtor current with Crocker except Roulier's unfulfilled promises to the bank. Roulier freely admitted that at least one of his motivations in filing this petition was to frustrate Crocker's foreclosure. Although this is common in all bankruptcies, it is one factor which the Court must examine.

This case is remarkably similar to the case of *In re Chesmid Park Corp.*, 45 B.R. 153 (Bankr.E.D.Va.1984). There the debtor delayed for several years the banks efforts to collect, interest was accruing, the debtor had no ongoing business or employees, and the sole asset was some vacant commercial land. The debtor there, as here, was formed solely to develop and ultimately sell the property.

The Debtor's motives here are really the motives of Roulier. The web of legal entities that he has spun are really just a shadow of his own personal financial empire. There is no doubt that he is the one in control and he is the one who caused this petition to be filed. There is also no doubt that in Roulier's mind Crocker's foreclosure was as a pesky fly buzzing around the carrion of his crumbling financial empire. He must deal with the fly, but the

problem is the carcass, *i.e.*, his dispute with DTC. Were it not for that dispute, the re-financing would probably have been approved and Crocker would have been paid. It is obvious that one of Roulier's primary motives in filing this petition was to keep himself in control of the property and to prevent the appointment of a receiver as requeted by the limited partners. As was stated in the *Matter of Golden Ocala Partnership*, 50 B.R. 552 at 557 (Bankr.M.D. Fla.1985), "... Chapter 11 was not designed ... to resolve internal fights between feuding stockholders." Nor is Chapter 11 to be used as a litigating tactic. *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849 (Bankr.S.D.N.Y.1984).

Roulier also listed the value of this property at $50,000,000.00. The Court finds that to be preposterous. Even Roulier's own appraiser (who can best be described as being in Roulier's hip pocket) valued the property at less than one-half that amount, and the bank's appraiser valued it at less than 20% of Roulier's value. The Court is convinced that Roulier's value is extremely inaccurate, so much so that the Court concludes it was placed in the petition only to mislead the Court.

This Debtor has no employees, is neither manufacturing nor selling any product, and indeed has no business to conduct. Roulier would have this Court exercise its jurisdiction solely to frustrate and delay Crocker until he can resolve his dispute with DTC. In the meantime interest accrues and Crocker is forced to become not a lender with property as security but rather an investor and speculator with Roulier and the DTC.

While it is true that there do seem to be legitimate creditors other than Crocker, their debts are *de minimis* and could easily be satisfied by Roulier or DTC out of "petty cash". Their inclusion herein was simply to lend legitimacy to the petition.

In summary, this Court finds the petition herein was filed in bad faith. It is, therefore,

ORDERED that the within proceeding is dismissed.

FURTHER ORDERED that within thirty (30) days of the date of this order, any party may file a written request for the withdrawal of his exhibits received in evidence or in the possession of the Court. Upon conclusion of all appellate review pertinent hereto, or upon expiration of time to initiate such review, as the case may be, exhibits so requested shall be returned. Thereafter, the Clerk may destroy or otherwise dispose of any exhibits not requested and returned in accordance with this order.