**In re Oscar G. LAND, Debtor.**

**Bankruptcy No. 87 B 00836 J.**

United States Bankruptcy Court,
D. Colorado.

Feb. 3, 1988.

---

William M. Bass, Pendleton & Sabian, P.C., Denver, Colo., Standing Chapter 12 Trustee.

Matthew D. Skeen, Skeen & Pearlman, Denver, Colo., for debtor.

James Ringenberg, Fischer, Brown, Huddleson & Gunn, Fort Collins, Colo., for Travelers Ins. Co.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH,
Bankruptcy Judge.

THIS MATTER came before the Court on July 20, 1987, upon the Debtor's Motion to Confirm his Chapter 12 Plan and Objection and a Motion to Dismiss filed by the Travelers Insurance Company ("Travelers"). Travelers also filed a contemporaneous Motion for Relief From Stay against the Debtor, Oscar G. Land ("Land") which was heard by the Court at the same time on July 20, 1987. The Debtor filed his Chapter 12 petition on January 26, 1987; thus, giving this Court jurisdiction pursuant to 28 U.S.C. § 157.

On August 31, 1987, this Court denied confirmation on a very narrow ground, i.e. "The plan is not feasible as required by 11 U.S.C. § 1225(a)(6) because the Debtor will have insufficient cash to pay both his creditors and the Trustee's fee." The Trustee and the Debtor had agreed that the total Trustee's fee would be $2,500.00. The Court, in interpreting 28 U.S.C. § 586(e)(2) held that such an agreement would not be approved because the Trustee was entitled to ten percent of all payments made through the Trustee. If such payments were made through the Trustee as contemplated under the Debtors then current plan, there were insufficient funds to satisfy the plan requirements. Thus, on September 8, 1987, the Debtor filed his Second Amended Chapter 12 Plan by which payments would be made directly to secured creditors, and not through the Trustee. This Plan retained the $2,500.00 fee for the Trustee.

Now, Travelers renews its original objections and the Trustee objects to payments not being made through his office and has "withdrawn his offer to settle this [fee] matter for $2,500.00".

## FINDINGS OF FACT

The instant matter involves a family farm which is owned by Mr. Land who has been a farmer all his life. Mr. Land purchased his 320 acre farm located outside of Herford, Colorado, in 1976. He and his son Charles work on the farm together which has two irrigation circles and has been the site of crop raising (alfalfa and corn) as well as cattle operations (limosine and dairy). The evidence is uncontroverted that Mr. Land acts in an advisory and working capacity on the farm and in both 1985 and 1986 received more than 50% of his income from the farm. Charles, who lives on the farm with his family, performs most of the labor but continually discusses matters pertinent to its operation with his father. The son also works at the U.S. Department of Agriculture in the County Agricultural Stabilization and Conservation Service (ASCS) office.

As noted, the farm is a father and son operation. There is no formal partnership agreement or lease but the parties have an understanding that Charles is responsible for the day to day farm management and financial aspects (e.g., tax, note, and other payments) while Mr. Land acts in an advisory and, when needed, labor capacity. Mr. Land testified that it is his intent to keep the farm in the family by passing it on to Charles after his death.

Sometime in 1984, Charles borrowed approximately $64,000.00 from the Farmers Home Administration ("FMHA") and used the proceeds to purchase the dairy cows previously owned by his father. FMHA is a secured creditor. Since that time, the Debtor's interest in the farm, besides holding title to it, is in the crops raised thereon, and the son's interest is in the dairy operation. Per FMHA requirements the farm account, which previously, comingled both the crops and the dairy operation, was bifurcated. Nevertheless, pursuant to their understanding, Charles pays all the debts on the property by using proceeds from these two income producing activities.

Due to an infection of the dairy herd by stomatitus and falling dairy prices, the farm faced a severe cash flow crisis. Charles testified that he mistakenly failed to monitor the cash situation believing instead that the land had increased in value therefore they were "doing O.K." In November 1985, he thought the land was worth $200,000.00. Shortly thereafter in December of that year he reevaluated his estimate down to $120,000.00 and seriously contemplated filing a Chapter 11 petition.

The Debtor borrowed $175,000.00 (the "First Note") from Travelers in 1976 and an additional $150,000.00 (the "Second Note") from Travelers in 1982. There is no dispute as to the validity of the Deeds of Trust or the Notes. The Debtor failed to make any payments on the Second note in 1986. This note matured on May 1, 1986. As a result of this default and after failure of the negotiations between Travelers and Charles to refinance the farm, foreclosure proceedings were instituted by that creditor, and the sale was set sometime on or before November 17, 1986.

Mr. Land explained that in order to stay the foreclosure he filed a Chapter 13 petition on November 17, 1986. Approximately three weeks later on December 9, 1986, the Debtor filed a Motion to Convert the case from a Chapter 13 to a Chapter 12. This motion was noticed to the Travelers on the following day. Anticipating the denial of the Motion to Convert, the Debtor filed a Motion to Dismiss the case which was granted on December 15, 1986. After the dismissal of the case, another foreclosure sale was set for late January 1987, and just prior to it on January 26, 1987, the Debtor filed his Chapter 12 petition.

The Amended Plan proposes to revalue the farm at $170,000.00 and to pay Travelers that amount plus 10% per annum over a twenty year period. The annual amortization payments will be $19,706.00 per year. Travelers will receive an additional $10,000.00 per year over the annual amortiza-

tion payment for four years. Charles agrees to guarantee these payments.

The source of funds for the Plan includes income from the farm via the sale of corn and via ASCS payments; Mr. Land's social security; rent received for a house owned by Mr. Land and a $10,000.00 contribution by Charles Land. Charles is enrolled in a federal government dairy buy-out program for which he has already received $206,-000.00. These proceeds have been used to pay farm debts including $70,000.00 to the Bank of Windsor, as well as other obligations. Future proceeds will be used to pay Travelers.

The Debtor introduced *pro forma* exhibits, which were not controverted by Travelers, that show that the total revenue for the farm will be $48,975.00 and expenses of $38,206.00 for 1987 when they were approximately $128,000.00 for 1986. The Debtor explained, which the Court finds credible, that the expenses are drastically reduced due mainly to large payments made in 1986 on then existing debts (e.g., the Bank of Windsor). Finally, the Debtor also agrees to re-amend his Plan to provide that any and all disposable income of the Debtor will be contributed to the Plan payments.

Two appraisers testified as to the value of the farm. The Debtor's appraiser gave his opinion as $170,000.00. Traveler's appraiser stated the value was $205,000.00, but his testimony lacks credibility as he is a recent former employee of Travelers. Furthermore, Travelers' Proof of Claim filed on April 23, 1987, states that the value of the collateral is $170,000.00. The Court finds that the farm's value is indeed that amount.

Travelers also objects as to the feasibility of the Plan because of Mr. Land's age, the proposed interest rate, and 20 years duration. They attempted to bolster this argument through the testimony of Chester D. Haines, also a Travelers' employee. Mr. Haines states that Charles would not quality for a loan from his company. However, Mr. Haines also testified that the terms of farm loans in today's market include: 9½–12% interest rates

over a 3–25 year duration. Given this testimony, the Court finds that the terms proposed by the Debtor: 10% interest over 20 years are reasonable.

CONCLUSION OF LAW

Several issues present themselves in this fact situation including:

(1) Whether the Debtor is eligible for relief under Chapter 12.

(2) Whether the plan is proposed in good faith.

(3) Whether the plan is timely filed.

(4) Whether the plan is feasible.

(5) Whether the Debtor has complied with § 1225(a)(5) regarding the treatment of Travelers.

(6) Whether the Trustee's compensation is lawful.

The threshold issue raised by Travelers objection pertains to Mr. Land's eligibility for relief under Chapter 12 of Title 11 ("the Code") which is entitled "Adjustment of Debts of a Family Farmer with Regular Income." This must be resolved in the Debtors favor pursuant to § 101(17) of the Code which provides:

"family farmer" means—(A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000.00 and not less than 80 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the claim is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceeding the taxable year in which the case concerning such individual or such individual and spouse was filed;

Mr. Land meets the eligibility criteria set forth therein. His debts do not exceed $1,500,000.00; not less than 80% of these

debts arise out of the farming operation; he owns the farming operation; and finally, and according to his tax return, he receives more than 50% of his gross income from the farm. Travelers objects ostensibly because Mr. Land is allegedly not "actively" engaged in the operation; however, the evidence noted herein shows otherwise. More importantly, the level of activity is not the statutory test; therefore, the Court concludes that Mr. Land is eligible for relief under Chapter 12.

■ Having overcome the initial hurdle, the second issue which must be addressed is whether this case was filed in bad faith. Travelers bases this allegation on several grounds. First, that both the Chapter 13 and 12 petitions were filed on the eve of foreclosure. Second, that the motive behind the petition is simply to protect Charles who is not a co-debtor herein. Third, that the schedules contain misrepresentations and omissions. Finally, that a twenty year payment for a 74 year old Debtor also indicates bad faith.

Section 1225(a)(3) states that "the Court shall confirm a plan if the plan has been proposed in good faith and not by any means forbidden by law". Since there is so little Chapter 12 precedent on this issue, the Court will look to similarly disputed Chapter 11 cases for guidance.

A review of this Court's opinion *In re Block K v. Associates*, 55 B.R. 630 (Bankr. D.Colo.1985) is appropriate. According to *Block K*, the three main areas of concern are: (1) the timing of the filing of the petition; (2) the Debtor's motive; and (3) the accuracy of the Debtors assertions in its petitions and scheduled. *Id.* at 633. It is axiomatic that no one factor should be controlling, and the weight given to each factor will vary with the facts and circumstances of each case. See *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983).

■ While it is true that both the initial Chapter 13 petition and later the Chapter 12 petition were filed on the eve of foreclosure, this, by itself, does not indicate bad faith. Travelers also alleges mistakes and omissions as an example of bad faith but

offered no evidence to support these allegations.

The Debtor testified that his motive for filing the bankruptcy petitions was to forestall the foreclosure in order to have the opportunity to reorganize the farm so that it could be passed on to his son Charles. That motive does not smack of bad faith. As noted, Charles will guarantee the payments owing to Travelers thus obviating their objection to the proposed twenty year payment. Moreover, Charles' lack of filing his own petition or joining in his father's is understandable because the Debtor has filed a confirmable plan which is more than reasonably likely to achieve the results which are consistent with the objectives and purpose of Chapter 12. *See In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984). The Court concludes there is no bad faith motive here and views the instant matter as perfectly consistent with Congress' intent in enacting Chapter 12, i.e. to save the family farm.

■ The third issue concerns the timeliness of the filing of the plan. Travelers alleges that the Debtor failed to file its plan in a timely manner pursuant to § 1221 which provides: "the debtor shall file a plan not later than 90 days after the order for relief under this chapter, except the court may extend such period if an extension is substantially justified". It must be noted that § 1221 does not have any sanctions provisions nor does it provide for the filing of competing plans as does § 1121. Clearly, Congress intended for the Debtor to have the exclusive right to file a plan subject only to Court orders.

An analysis of the sequence of events showed that the Debtor timely filed his plan. The Court's file is somewhat in disarray through no fault of the Debtor. On April 27, 1987, the debtor timely filed a Motion for Extension of Time to file his plan which this Court granted two days later. Due to the sheer volume of filings in this district, the Court issued an Order to Show Cause on May 1, 1987, requiring the Debtor to file his plan within 10 days or risk dismissal. The Order to Show Cause and the order Granting the Extension had

two different due dates, May 11, 1987, and May 7, 1987, respectively. The Debtor filed his plan on May 11, 1987, which is reasonable and timely given the confusion about which the Court can only exclaim *mea culpa*. Moreover, on June 11, 1987, at a hearing on a Motion for Relief from Stay, the Court ordered that the Debtor's amended plan be filed by June 26, 1987, which in fact occurred. Thus, under § 1221, the Debtor's filings have been timely and in compliance with Court orders.

The next issue, feasibility, arises under § 1225(a)(6) which provides that "the debtor will be able to make all payments under the plan and to comply with the plan." The overwhelming evidence from the Debtor's cash flow projections and receipt and disbursement projections (Exhibits 1 and 2) as well as the testimony offered by Mr. Land and Charles is that the plan is feasible. Travelers offered no independent evidence to rebutt this finding. Therefore, the Court concludes § 1225(a)(6) has been met.

The fifth issue regarding Travelers' treatment under the plan is the focus of the dispute herein. The pertinent statutory sections are §§ 1225(a)(5), (6) and (b). This section provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

This Court agrees that "[s]ection 1225(a)(5) provides that if a secured creditor has not accepted the plan and the debtor is not surrendering the collateral, the plan must provide for the creditor to retain its liens and receive the present value of its allowed secured claim". *In re Citrowske,* 72 B.R. 613, 616 (Bankr.D.Minn.1987). *C.F.,* § 1325. Here, these requirements are met. Travelers is keeping their lien and is being paid what the Court finds to be the present value ($170,000.00) of its allowed secured claim. The plan is also feasible as required by § 1225(a)(6).

Travelers' claim is clearly only partially secured thus making them an unsecured creditor *vis a vis* the remainder of their claim which gives them standing to raise an objection under § 1225(b). However, since the Debtor agreed to contribute all his disposable income to the plan, the statutory requirements of § 1225(b)(1)(B) have been met. "Section 1225(b) does not state specifically who would receive the disposable income. However, since these are clearly defined statutory bases for satisfying the claims of secured creditors and administrative expense claimants ... it is clear ... that the balance of the disposable income, if any, would be available for unsecured creditors." *Citrowske,* at 616. If there is any excess disposable income, Travelers, as an unsecured creditor, stands to gain an even greater repayment on that

portion of their claim which is not objectionable given the dictates of the Code.

■ Finally, we have the issue of the amount of the Trustee's fees. The two secured creditors herein are the First National Bank of Windsor (the "Bank of Windsor" or "Bank") and Travelers. The Bank of Windsor is fully secured, but there are defaults on its promissory note which the Debtor intends to cure although the plan does not say when or how. Thereafter, current mortgage payments will be made directly to the Bank as they come due. The Bank has no objections to the plan.

Travelers is undersecured because its collateral is worth only $170,000.00 but the claim is for $200,000.00 based on a promissory note and deed of trust. Travelers' claim is modified by the Debtor as to the interest rate, payment schedule, and balance due, which all differ from the terms of the original promissory note. The plan does, however, provide that Travelers' retain its lien as required by § 1225(a)(5). Language employed by the Debtor regarding the payment of Travelers is interesting given the nature of the discussion herein; it states: [t]he amount to be paid to Travelers *under the plan* can be prepaid in whole or in part, at anytime, but not more than once per year. Plan Article III 2(a) (emphasis added). The Second Amended Plan specifically states that the Debtor will make payments directly to Travelers. Travelers objected to the plan because of its treatment and feasibility but not to the direct payment provision.

The Chapter 12 Trustee objects to the plan because he fears (and accurately so) that the direct payment provision precludes his 10% fee.

A two step analysis is required in this situation. First, to determine whether the Code permits a family farmer to act as a disbursing agent who pays the creditors directly. Second, if so, may the Trustee assess his 10% fee to those payments. Before doing so, however, a brief analysis of analogous Chapter 13 cases is appropriate because several semantical problems arise in this area due to the terms "inside the plan" "outside the plan" "under the plan" and "direct payment."

*In re Foster*, 670 F.2d 478 (5th Cir.1982) is perhaps the seminal case on this topic. The debtors sought to cure their mortgage arrearages inside the plan pursuant to § 1322(b)(5) but also to directly pay the mortgagee the current mortgage payments outside the plan in order to avoid paying the Trustee's fees. In a lengthy analysis, basically four rules of law emerged from this case. First, the debtor may, at the court's discretion, act as a disbursing agent and pay the secured creditor directly. *Foster*, at 487. Second, if the creditor's claim is somehow modified (e.g. by curing the arrearages pursuant to § 1322(b)(5)), then all payments, whether direct or through the trustee, are considered to be "under the plan." *Id.* at 487–489. "Conversely, where a fully secured mortgage claim is not treated under the provisions of § 1322(b)(5), or any other provision of Chapter 13, payments on the claim need not be made under the plan." *Id.* at 489. Third, any payments considered to be "under the plan" are subject to the trustee's fee. *Id.* at 491. Fourth, the Trustee's fee is subject to adjustment by the court. *Id.* at 490–491.

In the reported cases the first three rules from *Foster* have generally been followed. *See e.g., In re Bradley*, 705 F.2d 1409 (5th Cir.1983); *In re Glasper*, 28 B.R. 6 (B.A.P. 9th Cir.1983); *In re Evans*, 66 B.R. 506 (Bankr.E.D.Pa.1986). However, the practice in this district does not match the second and third *Foster* rules. Instead, it is very common for a debtor in this district to cure the arrearage on their mortgage under the plan and pay the current payments directly. The Chapter 13 Trustee here does not (nor has it sought to) assess a fee on that direct payment.

The fourth *Foster* rule, the court's discretion to adjust the trustee's fee, depends on whether the case arose in a pilot U.S. Trustee's district. If not, the Trustee's fee was governed by § 1302(e) which allowed the bankruptcy court to adjust the trustee's fee if it was unconscionable. *Foster*, 670 F.2d at 491.

However, if the case arose in a pilot district, the fee was governed by 28 U.S.C. § 586(e) which gave the fee setting discretion to the Attorney General with the help of the U.S. Trustee and not the bankruptcy court.

> [I]n pilot districts, a standing Chapter 13 trustee's fees and expenses should come within the jurisdiction of the executive branch, in the person of the Attorney General. As acknowledged by the bankruptcy judge, *see In re Sousa,* 46 B.R. [343] at 344 [ (Bankr.R.I.1985) ], the statute contains no provision for judicial supervision of compensation paid to standing Chapter 13 trustees.

*In re Savage,* 67 B.R. page 700, 705 (D.C.R. I.1986).

Here the focus is on the statutes governing the U.S. Trustee's districts, but for a comprehensive discussion of the implementation of the U.S. Trustee system nationwide and the potential disparities between the fees paid in a non-U.S. Trustee district and those in an existing district *see In re Erickson Partnership,* 77 B.R. 738, 749–750 (Bankr.S.D.1987).

A few preliminary points regarding Chapter 12 need to be made before focusing on § 586(e). First, Congress indicated in Chapter 12 itself that the debtor can make payments directly to creditors. Section 1225(a)(5)(B)(ii) provides:

> (a) Except as provided in subsection (b) the court shall confirm a plan if—
>> (5) with respect to each allowed secured claim provided for by the plan—
>>> (B)(ii) the value as of the effective date of the plan, of property to be *distributed by the trustee or the debtor* under the plan on account of such claim is not less than the allowed amount of such claim. [emphasis added].

Additionally, § 1226(c) states: "Except as otherwise provided in the plan or in the order confirming the plan, the trustee shall make payments to the creditors under the plan." According to the most thorough analysis of this issue, "[I]ts plain language clearly provides that a farmer-debtor may directly pay creditors under his plan of reorganization." *Erickson Partnership,* 77 B.R. at 745.

In accordance with the second *Foster* rule that direct payments are allowed when the secured creditor's claim is not modified, direct Chapter 12 payments were approved in *In re Lenz,* 74 B.R. 413, 415 (Bankr.C.D. Ill.1987) and *Erickson,* 77 B.R. at 746–747. The bankruptcy court for the Northern District of Iowa held that whether the farmer-debtor could make direct payments was a matter of court discretion and subject to a "demonstration of the debtor's ability to make direct payments." *In re Hagensick,* 73 B.R. 710, 713 (1987). At least one court has allowed direct payments even where the creditors claim is modified (which parallels the current Chapter 13 practice in this district). *Erickson,* 77 B.R. at 748.

■ Given the language of §§ 1225(a)(5)(B) and 1226(c), and the cases construing them, it is clear the direct payments are permissible in Chapter 12 to secured creditors whose rights are not modified. Direct payments are likewise proper even if the claim is modified.

The next step in the analysis is to examine § 586(e) as it was amended by the 1986 Act. It reads in pertinent part:

> (e)(a) The Attorney General, after consultation with a United States trustee that has appointed an individual under subsection (b) of this section to serve as standing trustee in cases under chapter 12 or 13 of title 11, shall fix—
>> (A) a maximum annual compensation for such individual, not to exceed the [lowest] annual rate of basic pay in effect for step 1 of grade GS–16 of the General Schedule prescribed under section 5332 of title 5; and
>> (B) a percentage fee [,] not to exceed—
>>> (i) in the case of a debtor who is not a family farmer, ten percent, or
>>> (ii) in the case of a debtor who is family farmer, the sum of—
>>>> (I) not to exceed ten percent of the payments made under the plan of such debtor, with respect to payments in an

aggregate amount not to exceed $450,-000; and

(II) three percent of payments made under the plan of such debtor, with respect to payments made after the aggregate amount of payments made under the plan exceeds $450,000; based on such maximum annual compensation and the actual, necessary expenses incurred by such individual as standing trustee.

(2) Such individual shall collect such percentage fee from all payments received by such individual under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee. Such individual shall pay to the United States trustee, and the United states trustee shall [pay to the Treasury] deposit in the United States Trustee System Fund—

[1986 Amendments are underlined and deletions are in brackets.]

The critical amendment *vis a vis* the issue of the trustee's fee is found in subsection (e)(2) where Congress added the language "received by such individual." Obviously, Congress intended that the payment be received by the trustee for his fee to apply. The Congressional intent in § 586 is consistent with §§ 1225 and 1226 all of which approve the debtor's ability to make direct payments.

It can also be argued that, at least in Chapter 12, these statutes negate the rules of law found in *Foster* and its progeny. *Foster*, as noted, ruled that if payments were "under the plan" they were subject to the trustee's fee. Pursuant to the Chapter 12 statutes and the amended § 586(e), the issue of whether payments are "under" or "outside" the plan is moot. Instead, the critical issue is whether the trustee receives the payment, and if not no fee can be assessed.

The court in *In re Lenz*, 74 B.R. 413 (Bankr.C.D.Ill.1987) faced a situation in which the debtor sought to modify the rights of a secured creditor which the debtor planned to directly pay. In passing on the issue the court writes:

"it seems clear to this court the payments are pursuant to the plan and the debtors are implementing the exception authorized by Section 1226(c) by proposing a plan which provides for direct payments to the LAND BANK. The fact the payments are being made by the debtors in order to minimize the payments of the trustee's fees is no reason to conclude the payments are outside the plan.... " Therefore, this Court holds the payments are being made inside or pursuant to the plan, and the right of the LAND BANK can be modified.

*Lenz*, 74 B.R. at 415–416. Therefore, even if the secured creditor's rights are modified direct payments without the assessment of the trustee's fee are proper.

As an aside ... § 586(e) also applies to Chapter 13 cases. In its amended form the statute vindicates the common practice in this district of curing mortgage arrearages through the plan and making direct current payments to the mortgagee without paying the Chapter 13 trustee's fee on the direct payments.

At the preliminary hearing held on the Debtor's Second Amended Plan, the parties agreed to allow this Court to consider the evidence submitted on July 20, 1987, especially on the issue of value. However, it was pointed out that there may be changed circumstances, due to the passage of time, that will require new evidence. After examining the transcripts of the July 20, 1987, and October 30, 1987, hearings, the only issue that the Court perceives will require new evidence is on the appropriateness of the 10% interest being paid to Travelers. In all other respects, this Opinion and Order shall constitute the Courts final determination. It is, therefore,

ORDERED that an evidentiary hearing shall be held on *February 25, 1988,* at *3:30* p.m., on the issue of the appropriate interest rate to be paid to Travelers. In all other respects, the Debtor's Second Amended Plan is approved except that the Trustee's fees shall be based solely on the payments received by the Trustee for Payments to creditors.

FURTHER ORDERED that said hearing shall be held in in Courtroom C, United States Bankruptcy Court, 1845 Sherman Street, 4th Floor, Denver, Colorado.