**In re Fulton G. KLOBERDANZ and Martha Julia Kloberdanz, Debtors.**

**Bankruptcy No. 87–B–05954–M.**

United States Bankruptcy Court, D. Colorado.

Feb. 22, 1988.

C. Gordon Dickerson, C. Gordon Dickerson & Associates, Sterling, Colo., for debtors.

John Smiley, Sherman & Howard, Denver, Colo., for Commercial Bank of Sterling.

William M. Bass, Pendleton & Sabian, Denver, Colo., Standing Chapter 12 Trustee.

## ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Motion of Fulton and Julia Kloberdanz ("Debtors") to confirm their Amended Chapter 12 Plan and the two Objections to the Amended Chapter 12 Plan filed by William M. Bass, the Chapter 12 Standing Trustee ("Trustee"), and the Debtors' principal secured creditor, Commercial Bank of Sterling ("Bank"). The Bank also filed a Motion for Relief from Stay. All matters were heard concurrently by the Court on January 25, 1988. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157.

This particular Chapter 12 involves a small family farm operation which has been managed by the Debtors for approximately Twenty–One (21) years. Debtors have been farming for about Forty (40) years. The farm includes One Hundred Twenty (120) acres owned by the Debtors ("Homeplace") and Three Hundred Nine (309) acres leased by the Debtors.

Prior to 1987, the farm operation included production of cash crops as well as raising and selling livestock ("feedlot operation"), all of which was part of a larger, more emcompassing, farm unit owned and managed by the Debtors and their son, Wayne Kloberdanz. The feedlot operation lost money and it was eliminated in 1986. The overall farming operation was trimmed back in size and cost prior to 1987.

Based on 1987 production and budget records, the farm operation produces the equivalent of Two Hundred Forty–Three (243) acres of mixed crops from which the Debtors receive 100% of the revenues:

| Crop | Acreage |
| --- | --- |
| Corn | 159 |
| Corn set aside | 20 |
| Beans | 48 |
| Hay | 11 |
| Hay meadow | 5 |
| TOTAL: | 243 [1] |

The new reduced farm operation generated gross income in 1987 of Sixty–Four Thousand Five Hundred Eighteen Dollars ($64,518.00), *not* including the Debtors' monthly social security income:

| Sources of Income | Amount |
| --- | --- |
| Interest | 1,118.00 |
| Corn | 31,998.00 |
| Hay | 6,116.00 |
| Corn roughage | 620.00 |
| Beans | 10,993.00 |
| Government Support Program (ACSC) | 11,716.00 |
| Deposit (Gas) | 144.00 |
| Additional Government Program | 1,000.00 |
| TOTAL: | 64,518.00 |

Total farm operations' expenses for 1987 were Forty–Two Thousand Two Hundred Twenty–Six Dollars ($42,226.00) and net 1987 income was Twenty–Two Thousand Ninety–Two Dollars ($22,092.00). Of that sum, Five Thousand One Hundred Thirty–Five Dollars ($5,135.00) was spent for "actual costs of living" of the Debtors above and beyond those attributable, directly or indirectly, to the farm operation.

The Trustee and the Bank objected to confirmation on numerous different grounds. The principal objections and the major allegations on which most of the confirmation matters must be decided, can be succinctly stated as follows:

---

1. Of the total acreage owned and leased by the Debtors (120 Homeplace plus 309 leased), the revenues generated by crops grown on the Homeplace are received, 100%, by the Debtors whereas of the crops grown on the leased property, only 75% of the beans, 66% of the corn, and 50% of the hay revenue is retained by the Debtors, the balance is received by the landlord-lessor. The calculations reflect the net acreage, based on 1987 production figures, from which the Debtors receive revenue. On the leased property, the landlord pays a certain proportionate share of some costs such as fertilizers and herbicides, but does not pay a proportionate cost of tillage or harvest.

1. *Treatment of Secured Claim.* Debtors have undervalued the real property and personalty securing the Bank's claim and have used an unreasonably low rate of capitalization for the payout, all of which results in the secured creditor not being paid the full value of its allowed claim as required by 11 U.S.C. § 1225(a)(5)(B).

2. *Feasibility.* Debtors' plan is not feasible and they will not be able to reliably make all payments proposed under the plan, as required by 11 U.S.C. § 1225(a)(5)(B).

3. *Good Faith.* Debtors' plan is not proposed in good faith as required by 11 U.S.C. § 1225(a)(3).

4. *Application of Projected Disposable Income.* Debtors' plan has failed to adequately provide that "... all of the debtor's projected disposable income ... will be applied to make payments under the plan" as required by 11 U.S.C. § 1225(b)(1)(B) and (b)(2).

The Court will consider each issue in order.

1. *Treatment of Secured Claim.* The Bank maintains that it is not being paid the full value of its allowed secured claim as required by 11 U.S.C. § 1225(a)(5), which provides in pertinent part as follows:

(a) Except as provided in subsection (b), the court shall confirm a plan if ...

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

The Bank has not accepted the Debtors' plan and the property securing its claim is not being surrendered. Thus, the Debtors' plan can be confirmed only if it provides that the Bank retain its lien on the property and it receives property, or payments, over time equal to the allowed amount of its claim.

The plan provides that the Bank will retain its lien on the farm, the machinery and equipment, and other personal property. The question on this issue, then, is whether or not the Bank is receiving sufficient value, or payments over time, equal to the allowed amount of its claim. Put another way, is the Bank receiving under the plan, an amount equal to its allowed secured claim, the value of its collateral pursuant to 11 U.S.C. § 506(a), at a fair and legally sufficient discount or interest rate? To answer this question and decide the issue requires a two part analysis. First, what is the value of the collateral and second, what is a proper interest rate.

*Value of Farm.* First, the value of the Bank's collateral, meaning the farm, with its improvements, equipment and machinery, other personalty, and leasehold interest, is in dispute.

The Debtors' value estimate for the farm with improvements was Sixty Thousand Dollars ($60,000.00), about Five Hundred Dollars ($500.00) per acre. This is naturally biased testimony and it appears unreasonably low.

The Debtors, however, presented the only written, complete, and reasonably reliable appraisal report, with supporting testimony, by a qualified expert witness, Mr. Robert P. Blach.[2] His appraised value of the One Hundred Twenty (120) acre farm, with farmhouse, was Eighty-One Thousand Dollars ($81,000.00). The appraised value utilized seven comparable farm sales discussed in the report, plus two additional sales of comparable farm properties sold

---

2. Mr. Blach qualified as an expert in both real property and farm appraisals, as well as in farm management and operations. His professional and business activities included appraising, as well as buying and selling, managing, and operating farm properties.

within the two months prior to the Court hearing. One such property was purchased by the witness who owns and/or manages certain regional farm properties.

Creditor's expert, Mr. Pennington, verbally valued the subject property at One Hundred Twenty Thousand Dollars ($120,000.00) and relied on Seventeen (17) comparables, a good number of which were distant in time (two years), geographical location (15 to 20 miles away), and character (adjacent to commercial and/or residential development). Significantly, he was not familiar with the two most recent comparable sales referenced by Mr. Blach, nor had he personally examined the Debtors' improvements.

Simply stated, Mr. Blach's detailed data, more reliable comparables, specific familiarity with the subject property (including soils), and comprehensive report and testimony were more persuasive and more credible.

The wide disparity in estimated values on the farm property, however, coupled with the still greater disparity in values the experts attributed to the Debtors' 1890 residence ($10,838.00 versus $41,500.00), leaves the Court still uncertain as to value. The Court is not prescient as to these matters, but based on all the conflicting evidence and testimony specifically directed at that issue, the Court finds it appropriate and would thus add value to the residence as formulated by the Standing Trustee. The value of the residence on the farm is adjusted upward to Twenty–Three Thousand Three Hundred Dollars ($23,300.00), thereby establishing the value of the entire farm property at Ninety–Three Thousand Five Hundred Dollars ($93,500.00).[3]

*Value of Personal Property.* The value of the farm machinery and equipment serving as collateral, again based, in part, on the only timely independent, reliable appraisal available which was supplied by the Debtors, is Twenty–Two Thousand Two Hundred Ninety Dollars ($22,290.00). Values of other assets were essentially not disputed and thus the value of all personalty is Fifty–Four Thousand Two Hundred Ninety–Three Dollars and Twelve Cents ($54,293.12).[4]

■ The Bank is, therefore, entitled to retain its lien on the Debtors' property and receive the present value of its claim as a secured creditor,[5] the sum of One Hundred Forty–Seven Thousand Seven Hundred Ninety–Three Dollars and Twelve Cents ($147,793.12).

The Debtors' plan provides that the Bank is to be paid only One Hundred Thirty–Two Thousand Sixteen Dollars and Twelve Cents ($132,016.12) and, consequently, the plan cannot be confirmed, under its present terms, in that the creditor is not receiving value equal to the allowed amount of its claim.

■ *Discount Rate.* Second, the Bank challenges the adequacy of the discount rate, or interest rate, of 11.5% which the Debtors propose as part of their Fifteen (15) year payout to the Bank. This rate, the Bank maintains, does not afford it the full value of its allowed claim which is to be paid over Fifteen (15) years. The Bank is, of course, entitled to the full value of its allowed claim by the Bankruptcy Code and case law, as well as by the United States Constitution.

The right of the creditor to have the value of its claim "substantially preserved" over time and thus the right to an interest factor paid to assure receipt of the full amount of the claim is given constitutional standing. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 865, 79 L.Ed. 1593 (1935) [6]; *John Han-*

---

**3.** Residence to be valued at $20.00 p.s.f. or approximately $23,300.00 rather than $10,838.00 resulting in farm value increase from $81,000.00 to $93,560.00 rounded to $93,500.00.

**4.** Exhibit A, Debtors' Amended Plan of Reorganization.

**5.** ($93,500.00 plus $54,293.12—collateral real property plus personal property values.)

**6.** Justice Brandeis enumerated five rights to which the creditor was entitled constitutional protection under the Bankruptcy Act because the Bankruptcy Act is subject to the Fifth Amendment. Those five property rights are: (1) the right to retain the lien until the indebted-

*cock Insurance Co. v. Bartels,* 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939); *Consolidated Rock Products v. DuBois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed. 2d 235 (1982).

The Bank is entitled to the present value of its collateral which is equal to the present value of its allowed claim (11 U.S.C. § 506(a)); *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* — U.S. —, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Payment of that value, or claim, over time, here Fifteen (15) years, is obviously not the same as payment today. To assure a creditor payment of its full allowed claim over time, an interest factor must be added to the principal amount to be paid. After all, "... payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference...." *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir.1935); *See; In re Hardzog,* 74 B.R. 701 (Bankr.W.D.Okla. 1987).

What should the interest rate, or discount factor, be in this case pursuant to 11 U.S.C. § 1225(a)(5)(B)(ii)? The answer to this question is uncertain and unclear, it often is. Case law gives little precedent and firm guidance. Indeed, the cases are quite variable and inconsistent. Courts have held that the interest factor can be measured by (1) the cost to obtain replacement funds plus risk premium,[7] (2) the contract rate,[8] (3) the tax rate,[9] (4) state or federal legal rates,[10] (5) legal rate plus premium,[11] (6) prime rate,[12] (7) various U.S. treasury bill rates plus premium,[13] (8) an average of several rates,[14] (9) prevailing market rates,[15] and (10) investment return rates.[16]

In this case the Debtors offer to pay 11.5% interest over Fifteen (15) years. The original obligation to the Bank was a revolving line of credit bearing a 12.25% rate of interest, the then prevailing "commercial rate."

The vice president of the Bank testified that the Bank's current prevailing commercial "base rate" is 11%, that "workout loan" rates or restructuring rates are currently 11.5% or less, and that if the Bank were to now voluntarily make this loan to these Debtors—which it probably would *not*—then 12.5% would be an acceptable interest rate.

Mr. Blach, the Debtors' expert, testified, based on his personal experience and as an expert on farm values, management and finance, that current Federal Land Bank farm resale and refinance interest rates, in the locale, were as low as 8% to 8.95%, with 20% to 40% down payment. That testimony is probative, although diminished, by his observation that the Federal Land Bank is,

---

ness thereby secured is paid; (2) the right to realize upon the security by a judicial public sale; (3) the right to determine when such sale shall be held, subject only to the discretion of the court; (4) the right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself; (5) the right to control meanwhile the property during the period of default subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt.

**7.** *In re Hardzog,* 74 B.R. 701 (Bankr.W.D.Okla. 1987). *Also see, In re Hardzog,* 77 B.R. 840 (Bankr.W.D.Okla.1987).

**8.** *In re Cooper,* 11 B.R. 391 (Bankr.N.D.Ga.1981).

**9.** *In re Ziegler,* 6 B.R. 3 (Bankr.S.D.Ohio 1980) (26 U.S.C. § 6621).

**10.** *In the Matter of Crockett,* 3 B.R. 365 (Bankr. N.D.Ill.1980).

**11.** *In re Lum,* 1 B.R. 186 (Bankr.E.D.Tenn.1979).

**12.** *In re Miller,* 4 B.R. 392 (Bankr.S.D.Cal.1980).

**13.** *In re Levine,* 10 B.R. 168 (Bankr.D.Mass. 1981). fn. 4.

**14.** *In re Klein,* 10 B.R. 657 (Bankr.E.D.N.Y. 1981).

**15.** *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982).

**16.** *In re Jewell,* 25 B.R. 44 (Bankr.D.Kan.1982); *In re Citrowske,* 72 B.R. 613 (Bankr.D.Minn. 1987).

understandably, a "motivated seller" and receives money "up front".

None of these bits of evidence are, alone, dispositive of what is a fair and legally sufficient interest rate to assure the Bank of the present value of its collateral, when payments are extended over time. Frankly, nothing is or can be dispositive. Moreover, there is no testimony at trial *dispositive* of the issue of the "risk" here being undertaken (involuntarily) by the Bank.

The Bank is, after all, entitled to increased compensation for increased risk. This Court looks to those risk elements adopted by Judge Bohanon, in deciding the risk factor in this case: (1) duration of loan, (2) type of collateral, and (3) risk of default.[17]

The risk factors in this loan might be reasonably interpreted to be "high", largely due to this being a 100% leveraged loan, uncertain land values, and a loan at variance with the Bank's current lending standards. The risk may also, however, be reasonably interpreted as "low risk" because it is 100% collateralized, the farm operation already eliminated its financial drain (the feedlot operation), the Debtors each personally and substantially contribute to the farm business, unsecured debt is considerably reduced, and the Debtors have a demonstrated ability to budget correctly and perform according to budget projections in the "new" farm operation. *See, In re Hardzog*, 77 B.R. 840, 842 (Bankr.W.D. Okla.1987).

█ The totality of the circumstances in this case and the considerable testimony on this issue leads the Court to believe that an 11.5% interest to be paid on the allowed claim of the Bank, assures—not guarantees—that the Bank will receive the full present value of its allowed claim over time, the full present value of its collateral. There is here sufficient evidence and persuasive testimony that an 11.5% interest rate is fair and well within the acceptable range of interest rates prevailing in the pertinent marketplace and is sufficient to reasonably assure the lender of payment over time equal to, and not less than, the allowed amount of its claim. This rate is also very much in accord with the current *market rate* of interest, which is the measure of interest rates which other courts in this district have imposed as appropriate and necessary.[18]

This Court is mindful of and familiar with what currently is, in this District, a benchmark but unreported decision in *In re Newman*, Case No. 87-B-3567-E, on this issue of "cramdown" by Judge Matheson. That lucid discussion of Chapter 12 and secured creditor rights, resulted in denial of a Chapter 12 confirmation largely due to the debtors inability to carry its burden of proof that the value of the payment stream under the plan was equal to the allowed amount, or present value, of the claim. The Kloberdanz case is distinguishable. This is not a plan that proposes to make payments over Thirty-Two (32) years at a 9% rate of interest, a rate well below market rate.

2. *Feasibility.* Section 1225(a)(6) requires that a Chapter 12 plan may be confirmed only if "... the debtor will be able to make all payments under the plan and to comply with the plan." In short, the plan must be feasible.

This matter is sharply contested here—as is typically the case in Chapter 12. The objecting creditors challenged the Debtors as to (a) accuracy and reliability of projected future income and (b) soundness of expected future expenses.

As to projected *income*, it consists essentially of crop income and government payments; both sources of revenue can fluctuate, neither is guaranteed.[19] Based on 1987 crop production, per acre yields, and revenue generated, the Debtors' projected income is clearly sufficient to pay creditors

---

17. *In re Hardzog*, 77 B.R. 840, 842 (Bankr.W.D. Okla.1987).

18. *In re Hill*, Case No. 87–B–00018–J, decided 07/17/87, [available on WESTLAW, 1987 WL45033] Judge Brumbaugh.

19. Significantly, the Debtors have not incorporated their current $350.00 per month social security income in projecting future income for plan purposes, although it is and must be included for § 1225(b)(2) "disposable income" purposes.

according to the plan. There was considerable dispute on the issue of predicted yield per acre. There was, however, strong and persuasive evidence that *actual* production records of the Debtors, county yield averages, soil conditions of the subject farm, and relatively good water rights, can predictably sustain the yields needed to generate revenue necessary to make the plan work.

The Bank took exception to the income projections because a good portion of Debtors' operation uses leased farmland. Testimony of the Debtors and of two experts, however, revealed that leased farmland was a rather common and customary practice in the area and suitable alternative farmland was available to the Debtors if current leases were not renewed. There was challenge by the Bank as to the extent and sufficiency of crop insurance held by the Debtors but, again, countervailing testimony showed the insurance to be acquired and budgeted for was a standard government program and gave financial protection typical and acceptable in the farming industry.

Finally, the Bank questioned the government price support payments (ASCS) as not being reliable, stable or guaranteed in the future. That important and negative feature of government support payments was admitted as true by the Debtors. However, they and the experts acknowledged that payments based on acreage kept out of production (which these were), when and if reduced, can be compensated for with increased acreage devoted to crops and resulting increased crop income.

■ This Court is persuaded that the income projections are accurate, stable, and reliable. This conclusion is reinforced by the 1987 budgeted income and expenses which were demonstrably accurate and reliable when compared to 1987 actual income and expenses.

As to projected expenses, there was dispute and conflicting testimony as to various different specific items. None of the disputed expenses were, however, of major proportion or substantial impact. The end result, however, is that while differences as to expected expenses were expressed, again the expenses of 1987 as budgeted and as actually incurred demonstrate a sound basis on which the plan can be performed and be deemed feasible.

Feasibility is never certain, particularly in farm situations. It is an element of confirmation that is difficult to prove, equally difficult to decide. But, as Judge Matheson recognized in *Newman*, 11 U.S.C. § 1222(a)(6) does not require an "iron clad guarantee."

The Court must be persuaded that it is *probable*, not merely possible or hopeful, that the Debtors can actually pay the restructured debt and perform all obligations of the plan. This requires consideration of the farm's earning power, capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the farm. *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985); *In re Konzak*, 78 B.R. 990 (Bankr.D.N.D. 1987).

This Court is, indeed, persuaded that these Debtors are capable, committed and probable of performing their obligations in a complete and timely manner. The plan is feasible.

■ 3. *Good Faith.* The questions of whether or not a bankruptcy petition has been filed in good faith or whether a debtor's plan is proposed in good faith are often difficult to answer. In this case they are not.

"Good faith" or "bad faith" is an issue decided by looking at the facts of each case as measured against appropriate criteria of debtor conduct. Principal factors of a "good faith" filing question that certain bankruptcy courts have looked at, as recited by my colleague Judge Brumbaugh, include the following:

(1) the timing of the filing of the petition;

(2) the motive of the debtor in filing the petition; and

(3) the accuracies or inaccuracies of the Debtor's (sic) assertions in its petition and schedules.

*In re Block K Associates,* 55 B.R. 630, 633 (Bankr.D.Colo.1985).

The controlling, more specific, and encompassing considerations to be applied in determining the "good faith" of a plan of reorganization in the Tenth Circuit, are those enumerated in *Flygare v. Boulden,* 709 F.2d 1344, 1347 (10th Cir.1983):

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking relief; and

Measured by these non-exclusive criteria, or any other reasonable criteria, these Debtors have filed their plan in good faith. Certainly this Court believes that the Debtors and their plan reflect an earnest, honest, and realistic effort to pay to creditors a fair and full amount under the Code and as dictated by circumstances. Some characteristics of the Debtors' good faith, but certainly not all characteristics, include (1) an already substantially reduced "leaner" farm operation, (2) a relatively "short" Fifteen (15) year payout to its principal secured creditor, (3) sharing with its secured creditor any "upside" gain, or sales proceeds, of the farm, if sold during the term

of the plan, (4) a demonstrably frugal lifestyle and modest living expenses, and (5) substantial work and personal involvement of both husband and wife in management and day-to-day farm operations.

4. *Application of Projected Disposable Income.* The Chapter 12 Standing Trustee objected to confirmation of the plan because it does not provide for all of the Debtors' projected disposable income to be received during the plan to be applied to make payments under the plan (11 U.S.C. § 1225(b)(1) and (2)). Such a defect in the plan renders it not confirmable. The objection was met and satisfied, however, by the Debtors' offer to submit a second amended Chapter 12 plan which will provide that "... all of the Debtors' projected disposable income to be received ..." in the course of the plan shall be applied to make payments under the plan.

## CONCLUSION

Based on the findings of fact and conclusions of law set forth above,

IT IS ORDERED that, for the specific reasons stated above, the Motion for Confirmation of Chapter 12 Plan in the within matter shall be and is hereby DENIED.

IT IS FURTHER ORDERED that the Debtors shall be and are hereby granted a period of Twenty (20) days from the date of this Order within which to file a second amended Chapter 12 plan, failing which will result in an Order of dismissal.