In the Matter of Stephen **PIANOWSKI** and Kathleen **Pianowski**, Debtors.

Bankruptcy No. GK 87–01965.

United States Bankruptcy Court,
W.D. Michigan.

Oct. 25, 1988.

Robert B. Borsos, Kalamazoo, Mich., for Stephen and Kathleen Pianowski, debtors.

Timothy Hillegonds, Grand Rapids, Mich., for Federal Land Bank of St. Paul and Production Credit Ass'n of West Michigan.

Thomas C. Clinton, Grand Rapids, Mich., for Ethel Stears.

Joseph A. Chrystler, Kalamazoo, Mich., Chapter 12 trustee.

Ellen Ritteman, Grand Rapids, Mich., for U.S. trustee, Grand Rapids, Mich.

## MEMORANDUM OPINION RESPECTING CONFIRMATION OF SECOND AMENDED CHAPTER 12 PLAN

JAMES D. GREGG, Bankruptcy Judge.

### ISSUE

The principal issue before the court is whether the Debtors are legally permitted to make direct payments to certain creditors who hold allowed secured claims pursuant to the Debtors' proposed Second Amended Plan of Reorganization Under Chapter 12 of the Bankruptcy Code.[1] As a corollary, the issue also encompasses whether the Debtors must pay the applicable commission and expense percentage fee to the Chapter 12 Trustee, if direct payments are authorized to be made.

### BACKGROUND AND FACTS

The Debtors' Second Amended Plan of Reorganization, referred to herein as the "Plan", is similar to their first amended plan in many respects. However, in the first amended plan, the Debtors sought to unilaterally impose an aggregate limitation of four percent upon the Chapter 12 Trustee's commission and expense percentage fee. Because 28 U.S.C. § 586(e)[2] authorizes the Attorney General, after consulting with the United States Trustee, to establish the percentage fee, this court de-

1. The Bankruptcy Code, as amended, is set forth in 11 U.S.C. §§ 101–1330.

2. 28 U.S.C. § 586(e) states in part:
(1) The Attorney General, after consultation with a United States trustee that has appointed an individual under subsection (b) of this section to serve as standing trustee in cases under chapter 12 or 13 of title 11, shall fix—
(A) a maximum annual compensation for such individual, not to exceed the annual rate of basic pay in effect for step 1 of grade GS–16 of the General Schedule prescribed under section 5332 of title 5; and
(B) a percentage fee not to exceed—
(i) in the case of a debtor who is not a family farmer, ten percent; or
(ii) in the case of a debtor who is a family farmer, the sum of—

(I) not to exceed ten percent of the payments made under the plan of such debtor, with respect to payments in an aggregate amount not to exceed $450,000; and
(II) three percent of payments made under the plan of such debtor, with respect to payments made after the aggregate amount of payments made under the plan exceeds $450,000;
based on such maximum annual compensation and the actual, necessary expenses incurred by such individual as standing trustee.
(2) Such individual shall collect such percentage fee from all payments received by such individual under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee....

clined to confirm the Debtors' first amended plan.[3] In a previous opinion rendered from the bench, this court held, under the current statute, it lacked authority to establish or alter the percentage fee. The court reasoned that, just as it was unable to waive or modify other costs and expenses, such as the statutorily imposed filing fee, it also lacked the ability to adjust the percentage fee established by the Attorney General. After denying confirmation of the first amended plan, the court granted the Debtors additional time to file another amended plan. On July 24, 1988, the Debtors filed their Plan.

Stephen and Kathleen Pianowski, "Debtors", operate a family farm and are eligible for relief under Chapter 12 of the Bankruptcy Code. 11 U.S.C. § 109(f). The Debtors' farm, consisting of approximately eight hundred tillable acres, is located in St. Joseph County, near Three Rivers, Michigan. The Debtors are crop farmers who grow commercial corn, seed corn, and soybeans on their irrigated farm property. Nine creditors hold allowed secured claims respecting certain real or personal property owned or possessed by the Debtors.

The Federal Land Bank of St. Paul, "FLB", is a fully secured creditor, with an allowed claim of $423,385.00, pursuant to two recorded mortgages on the Debtors' real property. The Plan provides that the FLB's allowed secured claim will be paid, with interest, over a number of years upon certain terms and conditions. The FLB has agreed to its Plan treatment and has explicitly consented to receive direct future payments from the Debtors.

The Production Credit Association of West Michigan, "PCA", is a fully secured creditor, which now has an allowed claim of $28,147.96, in accordance with a valid and perfected security agreement which covers certain of the Debtors' farm equipment. The Plan provides the PCA's current allowed secured claim will be added to a new loan to be made by the PCA to the Debtors. The new aggregate loan amount will be amortized and paid based upon an agreement between the parties. The PCA has conditionally agreed to make the new loan to the Debtors. The PCA loan proceeds will be utilized to completely satisfy a settlement between the Debtors and Comerica Bank–Detroit. Upon making the payment, the PCA will receive an assignment of the bank's perfected secured position. The PCA has consented to its proposed Plan treatment. The PCA has also explicitly consented to receive direct future payments from the Debtors.

Ethel Stears is an undersecured creditor who holds an allowed secured claim in the amount of $126,000.00 pursuant to her status as a land contract vendor under Michigan law. The Plan proposes Ethel Stears will receive annual payments regarding her allowed secured claim, with interest, over a number of years. She has consented to her proposed Plan treatment. She has also explicitly consented to receive direct future payments from the Debtors.

Alvin Lammon is an undersecured creditor who holds an allowed secured claim in the amount of $4,464.20 pursuant to a subordinate recorded mortgage on certain real property. The Plan provides Alvin Lammon will be paid his allowed secured claim, with interest, in monthly payments over a number of years. Alvin Lammon has not consented or objected to the Plan. He has neither consented nor objected to receiving direct future payments from the Debtors.

The Agricultural Stabilization and Conservation Service, "ASCS", has a perfected secured lien in certain of the Debtors' stored crops. The ASCS holds an allowed secured claim of $132,115.94. The Plan proposes to treat the ASCS in accordance with all terms and conditions of the pre-filing agreement between the parties. The ASCS is not impaired. It has not objected to its Plan treatment. The ASCS has neither consented to nor objected to receiving future direct payments from the Debtors.

Ford Motor Credit Corporation, "FMCC", is a fully secured creditor who has an al-

---

3. Confirmation of the Debtors' first amended plan was also denied on certain other grounds. However, the parties have agreed, and the court has determined, that the deficiencies in that plan have been substantially corrected by the Plan which is now before the court.

lowed claim of \$12,618.02 pursuant to its valid and perfected security interest in a certain vehicle. The Plan provides FMCC is unimpaired. It will receive payments pursuant to the existing agreement between the parties. FMCC has not consented to receive direct future payments from the Debtors.

John Deere Company "Deere", is a fully secured creditor who has an allowed claim of \$83,693.62 in accordance with a valid perfected security interest which covers specific farm equipment. The Plan provides Deere will be paid its allowed secured claim, with interest, pursuant to modified terms over the next five years. Deere has not objected to the Plan. Deere has not consented to receive direct future payments from the Debtors.

DeKalb Equipment Leasing Corporation, "DeKalb", is the lessor of certain irrigation equipment possessed by the Debtors. DeKalb has agreed, as provided in the Plan, to transfer title of the irrigation equipment to the Debtors. In connection with the transfer, DeKalb will be granted a first perfected security interest in the irrigation equipment. The Debtors will pay DeKalb's reduced allowed secured claim of \$17,000.00, plus interest, over approximately the next five years. DeKalb has not objected to the Plan. The record is now unclear whether DeKalb has agreed to its Plan treatment. It has not consented to receive direct payments from the Debtors.

Comerica Bank–Detroit, "Comerica Bank", is the Debtors' major secured creditor pursuant to three separate notes. Comerica Bank has a first-position perfected blanket security interest in nearly all of the Debtors' tangible and intangible personal property. Comerica Bank has filed an amended proof of claim in the amount of \$263,562.08. After application of certain court-approved postpetition payments received by it, and adding interest and claimed attorneys' fees pursuant to its notes and security agreements, Comerica Bank now asserts a balance owed of approximately \$220,000.00. The Debtors dispute Comerica Bank's claimed balance. They allege Comerica Bank's attorneys'

fees are not reasonable. The Debtors also assert causes of action may exist against Comerica Bank to recover preferential transfers and to recover damages based upon lender liability. Pursuant to the Plan, the Debtors and Comerica Bank have agreed to settle all their disputes by the Debtors paying \$200,000.00 to the bank within thirty days after confirmation of the Plan. Pursuant to the settlement, the Debtors (and their estate) and Comerica Bank will mutually release each other from any and all claims that they may have against each other. The funds to pay Comerica Bank will be loaned to the Debtors by the PCA. Comerica Bank has agreed to its Plan treatment. It has consented to receive a direct payment from the Debtors at the closing of the new loan.

The Plan further proposes that the Debtors will pay \$15,000, in three annual payments of \$5,000 each, for the benefit of creditors who hold allowed unsecured claims. These annual payments will be divided among those unsecured creditors on a prorata basis.

The Plan provides that *all* payments by the Debtors to the nine secured creditors, to entities who hold administrative expense claims, and to lessors whose leases have been assumed, shall be made directly to those entities without supervision or involvement by the Chapter 12 Trustee. The Plan provides that *only* the annual payments for the unsecured claims shall be made to the Chapter 12 Trustee for disbursement to unsecured creditors.

Joseph A. Chrystler, the Chapter 12 Trustee, "Trustee", and the United States Trustee have each objected to the Plan. They assert that the proposed direct payments violate applicable provisions of Title 11 and Chapter 12. 11 U.S.C. § 1225(a)(1). If direct payments to secured creditors are authorized, the Trustee argues his future compensation may become inadequate.

If the proposed direct payments are legally permissible, it is conceded by the parties, and the evidence mandates a finding, that the Plan shall be feasible. 11 U.S.C. § 1225(a)(6). To the contrary, if certain direct payments to creditors who hold large

allowed secured claims are not legally permissible, it is conceded by the parties, and the evidence mandates a finding, that the Plan shall not be feasible and confirmation of the Plan must be denied.

## DISCUSSION

Other courts have considered the issue before this court and have reached conflicting results. Based upon the current state of reported case law there is no consensus or compelling weight of authority respecting the resolution of the issue presented.

*In re Hagensick*, 73 B.R. 710 (Bkrtcy.N. D.Iowa 1987), considered the ability of Chapter 12 debtors to make direct payments. While acknowledging a debtor may act as a disbursing agent in the court's discretion, the court held "a Chapter 12 debtor may treat creditors outside of the Chapter 12 plan *only if* the debtor in no way alters, modifies or adjusts the rights or claims of the creditor, and in no way seeks to invoke the jurisdiction of this Court over the rights or claims of the creditor." 73 B.R. at 714 (emphasis added). The court also concluded that all direct payments made "under the plan" by the debtor are subject to the trustee's statutory percentage fee established by 11 U.S. C. § 1202(d)(1)(B) (repealed 1986). In dicta, addressing the possible conflict between the goals of adequately compensating the trustee and keeping Chapter 12 relief affordable for debtors, the court noted there existed "flexibility for the parties to negotiate a different rate" and a court could "alter the rate where the trustee's efforts and fee are disproportionate."[4] 73 B.R. at 714. In light of 28 U.S.C. § 586(e), the court's previous statutory flexibility to

modify the trustee's percentage fee has evaporated.

*In re Citrowske*, 72 B.R. 613 (Bkrtcy.D. Minn.1987) disagrees with *Hagensick* regarding the issue of whether a debtor may act as a disbursing agent under a confirmed Chapter 12 plan. *Citrowske* states there is "no provision for nor need for a disbursing agent" and it is the trustee's duty under 11 U.S.C. § 1226(a) to distribute plan payments. 72 B.R. at 615. *Citrowske* is consonant with this judge's previous bench opinion to the extent that it states "the court is without authority to determine or in any way adjust the compensation or reimbursement of expenses of [the] standing trustee." 72 B.R. at 615. *Citrowske* indicates the commonly used terminology regarding payments "outside the plan" is a misnomer for "direct payments". *Citrowske* holds "with the possible exception of unaltered regular contractual payments on long term debts, which are much the same as other regular current monthly expenses, all payments to creditors or administrative expense claimants are paid under the plan and thus subject to the trustee's percentage fee." 72 B.R. at 615–616.

*In re Erickson Partnership*, 77 B.R. 738 (Bkrtcy.D.S.D.1987), *aff'd*, 83 B.R. 725 (D.S.D.1988), recognizes the controversy respecting whether, and under what circumstances, direct payments may be made by Chapter 12 debtors. Based upon its discussion of reported cases decided to the date of decision, review of relevant statutory provisions, recognition of congressional intent in the adoption of Chapter 12, and identification of possible conflicting policy goals, *Erickson* held:

... Chapter 12 of the Bankruptcy Code permits a "family farmer" debtor (farm-

---

4. Section 1202(d) was repealed pursuant to § 227 of the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986. The Attorney General, in conjunction with the U.S. Trustee, and not a bankruptcy court, now possesses the power to establish a Chapter 12 trustee's percentage fee. See n. 2 *supra* and accompanying text. The experience of this judge, to date, is that responsible persons in the U.S. Trustee system are either unable or unwilling to negotiate a different percentage rate. This lack of flexibility precludes or se-

verely limits some family farmer debtors from obtaining effective relief in certain cases. In this judge's perception, the standing Chapter 12 trustees may be willing to exercise reasonable discretion regarding their percentage fees on a case-by-case basis but cannot do so because "their hands are tied". In fairness to the U.S. Trustee, the court believes he may be very reluctant to modify the percentage fee on a case-by-case basis because of the possibility that parties in interest may question his judgment or allege unfair discrimination.

er-debtor) to directly pay creditors under his plan of reorganization, and not through the Trustee, when: a) the creditor's approved claim is not modified in the debtor's plan of reorganization, *if:* i) that creditor is fully secured; *or* ii) pursuant to the Bankruptcy Code, that debtor is required to cure any default and make payments according to the contract terms; *or* b) the creditor's approved claim is modified, *if:* i) that creditor's claim receives the same treatment as other claims within a particular class of creditors, unless that creditor agrees to less favorable treatment; ii) that creditor's claim is not "preferred" to other "unsecured" creditors similarly situated, thereby unfairly discriminating against those creditors; iii) that creditor has established a self-monitor and remedy device in the event of plan obligation failure; *and* iv) that creditor does not object to direct payment....

77 B.R. at 745. After finding the direct payments proposed neither required the direct supervision of the trustee nor undermined the funding of the Chapter 12 trustee's office, *Erickson* held the trustee "may not assess a ten percent fee on direct payments made by the debtors to the creditors, First Federal and Metropolitan, under their plan of reorganization." 77 B.R. at 753.

In the case of *In re Hildebrandt*, 79 B.R. 427 (Bkrtcy.D.Minn.1987), the debtors' plan proposed all creditors, except unsecured creditors, would be paid directly "outside the plan". After objections were filed by the Chapter 12 trustee and the United States Trustee, the court stated: "The format of Chapter 12 and 28 U.S.C. § 586 contemplates that most if not all of the payments made by Chapter 12 debtors will be made under a plan of reorganization." 79 B.R. at 428. After considering the possible effect of direct payments, without paying the percentage fee, upon the salaries of the Chapter 12 trustees and the possible excess payments that might be received by the United States Trustee system, the court opined, "the entire statutory scheme will be circumvented and the quantity, if not the quality, of Chapter 12 trustees could diminish substantially." 79 B.R.

429. Relying upon *Hagensick,* the court held the Chapter 12 percentage fee must be paid with regard to all creditors whose rights or the rights of substantially similar creditors have been modified under the plan.

In *In re Greseth,* 78 B.R. 936 (D.Minn. 1987), the district court, on appeal, relying upon *Hildebrandt, Hagensick,* and *Citrowske,* stated that neither Chapter 12 nor 28 U.S.C. § 586(e) contemplated that direct payments should be made with the possible narrow exception of unaltered regular payments on long-term debts. After considering the Chapter 12 trustee's salary and the duty of a trustee to monitor payments under a confirmed plan, the court held a Chapter 12 trustee was entitled to receive the percentage fee with respect to both delinquent real estate tax payments and administrative expense payments.

The cases of *In re Land,* 82 B.R. 572 (Bkrtcy.D.Colo.1988) and *In re Crum,* 85 B.R. 878 (Bkrtcy.N.D.Fla.1988) follow the rationale of *Erickson.* In *Land,* after discussion of certain Chapter 12 provisions and 28 U.S.C. § 586(e), the court concluded a debtor had the ability to make direct payments, even if the secured creditors' rights are modified. 82 B.R. at 579. If the Chapter 12 trustee does not *receive* such payments, the trustee is unable to assess or recover his percentage fee. 82 B.R. at 580. In *Crum,* the court held that direct payments to secured creditors under Chapter 12 are permissible notwithstanding that their claims are modified by the plan, provided that the debtor's direct payments do not unfairly discriminate and the payments are proposed in good faith. When direct payments are permitted, the Chapter 12 trustee may not recover the statutory percentage fee. 85 B.R. at 879.

The most recent reported case which addresses the issue is *In re Logemann,* 88 B.R. 938 (Bkrtcy.S.D.Iowa 1988). After reviewing certain statutory provisions, legislative history, previously decided case law, and its policy concern regarding attracting qualified trustees and providing reasonable compensation to such trustees, the court held that plan payments with respect to the

treatment of secured creditors' modified claims are subject to the trustee's percentage fee. In its discussion, *Logemann* rejected the reasoning of *Erickson* and *Land,* among other reasons, on policy grounds. *Erickson* and *Land* necessarily require a bankruptcy court to frequently exercise discretion to determine if and when direct payments may be made. *Logemann* implicitly adopts a "bright line" test respecting the trustee's entitlement to a percentage fee, i.e., "the critical question with regard to calculation of the trustee's fee is whether the payment in issue is upon an impaired claim and is not whether the trustee makes the payment." 88 B.R. at 941.

It appears that the reported cases discussed above may be roughly divided into one of two categories. The first group of cases either prohibits direct payments, strictly limits a debtor's ability to make direct payments to creditors or, even if direct payments are permitted, mandates that such payments will be subject to the trustee's statutory percentage fee. *In re Citrowske,* 72 B.R. 613 (Bkrtcy.D.Minn. 1987); *In re Hagensick,* 73 B.R. 710 (Bkrtcy.N.D.Iowa 1987); *In re Hildebrandt,* 79 B.R. 427 (Bkrtcy.D.Minn.1987); *In re Greseth,* 78 B.R. 936 (D.Minn.1987); *In re Logemann,* 88 B.R. 938 (Bkrtcy.S.D. Iowa 1988). In most of these cases, the key question is whether the affected creditor's treatment has been modified by the proposed Chapter 12 plan. These cases all explicitly or implicitly address the policy consideration that qualified standing trustees must be attracted and retained and that the trustees must receive adequate compensation. All cases which have heretofore adopted this narrower view have been decided by Minnesota or Iowa courts.

The second group of cases permits a debtor to make direct payments to secured creditors, with such payments not subject to the trustee's statutory percentage fee, notwithstanding that such creditors may have their rights modified under the proposed Chapter 12 plan. *In re Erickson Partnership,* 77 B.R. 738 (Bkrtcy.D.S.D. 1987) *aff'd,* 83 B.R. 725 (D.S.D.1988); *In re Land,* 82 B.R. 572 (Bkrtcy.D.Colo.1988); *In re Crum,* 85 B.R. 878 (Bkrtcy.N.D.Fla. 1988). The rationale of these cases is that the bankruptcy court should consider the proposed direct payments on an instance-by-instance basis and the court should exercise discretion in reviewing Chapter 12 plans. This broader view focuses upon a policy which favors Chapter 12 reorganizations.

This court recognizes that the Chapter 12 statutory provisions and 28 U.S.C. § 586, construed together, are somewhat ambiguous. This court is also cognizant of the conflicting policy considerations and the existence of legislative history which may be utilized to support either the narrower or broader view adopted by those cases cited above. The statutory framework is somewhat akin to a jigsaw puzzle with missing or ill-fitting pieces. After careful consideration, notwithstanding the jumbled jigsaw, this court believes that the analysis and the broader view of *In re Erickson Partnership,* and its progeny, is more persuasive than *Citrowske, Hagensick,* and the other cases which adopt the narrow view.

As pointed out by the bankruptcy court and the district court in *Erickson,* certain Chapter 12 statutory subsections support an interpretation that direct payments may be authorized. Although "the trustee shall make payments to creditors under the plan", the plan or the order confirming the plan may provide to the contrary. 11 U.S.C. § 1226(c). Therefore, while a trustee typically will make distribution to creditors under the plan, such a distribution method is not *always* required. With respect to distribution of property to holders of allowed secured claims pursuant to a plan, such distributions may be made by "the trustee or the debtor under the plan". 11 U.S.C. § 1225(a)(5)(B)(ii). The plan need only provide for the "submission of all or such portion" of the debtor's future income to the trustee as is "necessary for the execution of the plan". 11 U.S.C. § 1222(a)(1). If a direct payment is to be made to a secured creditor and that creditor has consented to such treatment, there may exist no reason to require that the payment be first submitted to the trustee.

With respect to the Chapter 12 trustee's entitlement to the percentage fee, the trustee shall collect the percentage fee from all "payments received" by him under plans in Chapter 12 cases. 28 U.S.C. § 586(e)(2). It is both curious and noteworthy that § 586(e)(2) does not state "payments received or that could have been received", "payments made by the trustee or debtor under the plan", or other similar language which would mandate payment of the percentage fee on a constructive receipt basis.

Although the policy concerns regarding a Chapter 12 trustee earning an adequate salary and the overall funding of the United States Trustee system are both important, and must be considered, those policy considerations should not be deemed to always be compelling. In this court's opinion, the policy considerations addressed in the Congressional Record respecting the spirit and purpose of Chapter 12 are equally important to, if not more important than, those considerations respecting salaries of Chapter 12 trustees and funding of the United States Trustee system.

Chapter 12 was created by Congress because many family farmers, as the Debtors in this case, cannot qualify under Chapter 13 because their debts exceed the statutory limits. 11 U.S.C. § 109(e). Further, the possible Chapter 11 relief to family farmers is often "needlessly complicated, unduly time-consuming, inordinately expensive and, in too many cases, unworkable." H.R.Conf.Rep. No. 99–958, 99th Cong., 2d Sess. 48 (1986), U.S.Code.Cong. & Admin. News 1986, 5227, 5249. Chapter 12 is intended to "give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." *Id.* In Chapter 12, it is intended that family farmers will receive "important protection from creditors"; however, Chapter 12 is also intended to prevent abuse of the bankruptcy system and to ensure farm creditors will receive fair debt repayment treatment. *Id.* Under Chapter 12, Congress intended "it will be easier for a family farmer to confirm a plan of reorganization." *Id.* This court agrees with the above-quoted legislative history statements.

The court also agrees with certain statements made by Senator Thurmond relating to the purpose of Chapter 12:

The legislation is meant to assist those farmers who have the true potential to reorganize and to allow them relief from heavy debt burden, and yet allow farmers to pay creditors what is reasonable under today's difficult economic situation. The conferees intended to maintain the balance in farm communities between suppliers, creditors, and farmers.

It is recognized that creditors should not shoulder all the burden of the current farm crisis and that creditors are at risk as well. When administering this chapter 12, the courts should strive to preserve this equity balance between creditors' and debtors' rights. They should appreciate the possibility of harsh consequences to secured and unsecured creditors in providing financial relief to farmers. Attempting to balance the conflicting objectives of farmer debtors and agricultural creditors has been a monumental task at best. . . .

132 Cong.Rec. S15074 (daily ed. October 3, 1986) (remarks of Sen. Thurmond).

In this case, the objection to confirmation lodged by the Trustee and the United States Trustee is both anomalous and somewhat strange. If this court holds that all Plan payments to secured creditors must be made through the Trustee, or that even if direct payments are permitted they must always be subject to the Trustee's percentage fee, the Plan cannot be confirmed. Under the existing facts, if this objection is upheld, it is likely impossible that *any* Chapter 12 plan proposed by these Debtors can be confirmed. If confirmation is denied, all parties in interest will probably be harmed—the Debtors will be unable to reorganize and will likely lose their farm, the creditors will not be paid in accordance with the Plan and will likely ultimately receive less under a Chapter 7 case or pursuant to their respective state law remedies, and the Trustee will receive *no* percentage fee commission whatsoever. Assuming arguendo that an amended plan could be confirmed, which paid the statu-

tory percentage fee to the Trustee with respect to all direct payments made, this would result in a grossly inequitable windfall to the Trustee and the U.S. Trustee system. For example, only addressing Comerica Bank's allowed secured claim, the Trustee would be entitled to receive ten percent of $200,000.00, i.e., $20,000.00, for doing nothing more than receiving the new loan proceeds from the PCA and then writing a check to Comerica Bank to satisfy its agreed-upon modified treatment under the Plan. This court does not believe that the Chapter 12 statutory provisions and 28 U.S.C. § 586(e) should be construed in such a manner.

 Based upon *Erickson, Land,* and *Crum,* this court's interpretation of applicable statutory provisions, the Chapter 12 legislative history and public policy considerations, this court holds that a Chapter 12 debtor may be permitted to directly pay secured creditors and administrative attorneys' fees pursuant to a Chapter 12 plan of reorganization. When direct payments are authorized by the court, such payments will not be subject to the trustee's statutory percentage fee established by 28 U.S.C. § 586(e).

 *A debtor does not have an automatic or absolute right to make direct payments* to designated creditors.[5] With respect to administrative claims, priority claims, and secured claims, this court will consider whether direct payments should be permitted on a case-by-case basis and, within a given case, on an instance-by-instance basis.

In each Chapter 12 case, various factors may be relevant to determine whether a direct payment to a specific creditor should be permitted. In establishing possible factors to be considered, this court has focused upon the needs and responsibilities of Chapter 12 debtors, the affected creditors' rights, and the integrity of the bankruptcy system, including those policy considerations of attracting qualified standing trustees, paying those trustees an adequate salary, and the funding of the United States Trustee system. This court is also mindful that equitably balancing these various factors will sometimes be difficult to achieve; in certain instances, some factors must necessarily be accorded greater or lesser weight based upon the facts and the exigencies of each case.

 The following non-exclusive factors will be considered by this court in determining whether a direct payment may be permitted pursuant to a Chapter 12 plan:

1. The past history of the debtor;[6]

2. the business acumen of the debtor;[7]

3. the debtor's post-filing compliance with statutory and court-imposed duties;[8]

4. the good faith of the debtor;[9]

5. the ability of the debtor to achieve meaningful reorganization absent direct payments;[10]

---

5. As dicta, this court opines that it is extremely unlikely that direct payments will be authorized to an unsecured creditor or a class of unsecured creditors. Because this issue is not presented in this case, the court will decline to engage in any meandering surmise whether it will ever permit a direct payment to be made to unsecured creditors.

6. What was the debtor's motivating factor or factors in seeking relief under Chapter 12? Does the debtor have a sincere desire to reorganize and adjust his or her debtor-creditor relationships as permitted by law? Have there been repetitive filings? Have there been confirmed plans in the past which were not consummated?

7. What are the debtor's management abilities? Does it appear the debtor will be able to efficiently operate his or her farming operation in the future? Is the debtor capable and readily able to maintain accurate and reliable records regarding both the farming operations and the future payments that may be made directly to creditors?

8. Has the debtor complied with all court orders? Has the debtor reasonably cooperated with the trustee? Has the debtor accurately prepared and timely filed any necessary and required reports or accounts with the court, the trustee, and other specified entities?

9. Are the direct payments, as compared to the overall plan itself, proposed in good faith? Does the debtor have any explicit or implicit improper ulterior motive in proposing direct payments to a specified creditor or creditors?

10. If a proposed direct payment is prohibited, will the debtor's plan be feasible? Must a direct payment be authorized in order for the debtor to receive a meaningful opportunity to reorganize under Chapter 12?

6. the plan treatment of each creditor to which a direct payment is proposed to be made; [11]

7. the consent, or lack thereof, by the affected creditor to the proposed plan treatment; [12]

8. the legal sophistication, incentive and ability of the affected creditor to monitor compliance; [13]

9. the ability of the trustee and the court to monitor future direct payments; [14]

10. the potential burden on the Chapter 12 trustee; [15]

11. the possible effect upon the trustee's salary or funding of the U.S. Trustee system; [16]

12. the potential for abuse of the bankruptcy system; [17]

13. the existence of other unique or special circumstances. [18]

In applying the above factors, the court must carefully balance an individual debtor's needs and desires to succeed in his or her reorganization efforts, a creditor's rights in preserving its property interest and receiving fair repayment of its indebtedness, and society's interests in an efficient, economical and non-abusive bankruptcy reorganization process.

The court must now apply various relevant factors to the direct payments proposed to be made to the nine secured creditors and the administrative attorneys' fees claimant. In each instance, the court must determine whether the proposed direct payment is permissible.

The first focus is upon the Debtors. The Debtors have come before the court with a

**11.** Is the affected creditor's claim being modified or altered pursuant to its treatment under the proposed plan? Is the debtor current in his or her pre-petition obligations to the affected creditor? If pre-petition defaults exist, what is the magnitude and type of such defaults? Will any defaults be speedily cured?

**12.** Has the creditor consented to receive direct payments from the debtor? Was the affected creditor actively involved in negotiating its proposed treatment under the plan? Does the affected creditor agree with its proposed treatment under the plan? Alternatively, does the creditor desire to have the trustee receive all payments from the debtor, then distribute payments to the creditor, and monitor the debtor's compliance respecting payments?

**13.** Is the amount of the creditor's allowed claim sufficient to warrant that the creditor will likely monitor future direct payments? Does the creditor have adequate incentives to monitor the debtor's direct payments and bring future defaults to the attention of the trustee and the court? Will it be unduly burdensome or expensive to require the creditor to monitor future direct payments? (For example, with regard to a given creditor, there may be an important distinction whether the proposed direct payments are to be made on a monthly, quarterly or annual basis.) Has the affected creditor been represented by competent counsel in connection with the case? Does the creditor have the ability to obtain advice from counsel in the event of a default?

**14.** Is the debtor willing to provide periodic reports and accounts to the trustee, and other interested parties, which evidence that direct payments have been timely made? Will the debtor make all direct payments in such a manner so as to conclusively document that the requisite payments have been timely made, e.g., by check?

**15.** Is direct supervision by the trustee required or prudent with regard to a given proposed direct payment obligation? Will the approval of direct payments to a creditor or creditors result in a greater or unwarranted burden upon the trustee?

**16.** Will authorizing a direct payment result in the standing trustee receiving less than adequate compensation for his efforts, duties, and responsibilities in connection with the case? Will a requested direct payment undermine the funding of the United States Trustee's office?

**17.** Will authorizing a direct payment create a prejudicial possibility of preferential treatment between or among those creditors who will receive direct payments and those who will not? Will a proposed direct payment result in any *unfair* discrimination among creditors or classes of creditors? Is it in the debtor's and all creditors' best interests to confirm the plan notwithstanding a proposed direct payment? Does the plan address future enforcement problems or available remedies in the event the debtor fails to make a required direct payment? Does the plan explicitly mandate that the court will retain jurisdiction to fashion meaningful relief for an aggrieved party who may not timely receive a direct payment?

**18.** Do any other facts exist which weigh favorably or unfavorably with respect to any proposed direct payment?

sincere desire to reorganize their family farming business. The Debtors' motivating factor in filing this case resulted from a dispute with Comerica Bank, the Debtors' major secured creditor. The bank accelerated its indebtedness, called its note, and instituted proceedings against the Debtors in the state circuit court to repossess most of the Debtors' tangible and intangible personal property. The Debtors reasonably believed they might lose their farm. Therefore, they filed for Chapter 12 relief; they believed Chapter 12 would afford them a much better opportunity to restructure their indebtedness and save their farm. The Debtors have not previously sought bankruptcy relief. Prior to filing, the Debtors operated a relatively successful and sophisticated farming operation. Since commencement of the case, with one exception which resulted from erroneous advice by their previous counsel, the Debtors have complied with their statutory duties and all court orders. The Debtors are competent farm managers. It appears they have a reasonable, and perhaps substantial, opportunity for post-confirmation success given the uncertainties of the farm economy, market forces, and weather. The Debtors have the ability, through use of their computer, to keep and maintain accurate and reliable business records; they have done so in the past. (In this court's experience, this is not the situation with many family farmers.) The Debtors are willing and able to provide future information to parties in interest, including the Trustee, regarding their income, expenses and the status of any direct payment obligations. The Debtors are in good faith both with regard to their Plan and the proposed direct payments. As discussed above, if this court does not authorize at least some of the proposed direct payments, the Debtors shall be denied a meaningful opportunity to reorganize and retain their family farm. Dismissal or voluntary conversion to Chapter 7 may result.

The second focus is the possible burden upon the Trustee and the possible adverse effect upon the integrity of the bankruptcy process. The preponderance of evidence has not established that the Trustee will be unduly burdened as a result of the proposed direct payments. There is no evidence that the proposed direct payments will result in preferential treatment between or among creditors. Likewise, there is no evidence that direct payments will result in unfair discrimination. No improper ulterior motive regarding the proposed direct payments is apparent. Those creditors who have appeared at the confirmation hearing have supported the Plan and the Plan appears to be in the best interests of the Debtors and all creditors treated under the Plan. The Plan provides this court will retain jurisdiction to enforce its provisions.

An important factor is that the Plan now provides the Trustee will only receive a percentage fee for payments made to unsecured creditors, i.e., ten percent of $15,000.00 which equals $1,500.00. Given the complexities of this case and the Trustee's efforts and participation to date, a $1,500.00 fee is not sufficient to adequately compensate the Trustee.

The third and final focus is upon those factors relating to the secured creditors to which direct payments are proposed. Each creditor must be separately considered.

■ The FLB is a legally sophisticated creditor who has been actively involved and represented by competent counsel throughout this case. The FLB holds a substantial allowed secured claim. Although the FLB's rights have been modified under the Plan, its treatment under the Plan has been negotiated. The FLB has consented to its Plan treatment. The FLB has explicitly consented to receive future direct annual payments. The FLB has the economic incentive and is willing to monitor future direct payments. It is capable of taking prompt action to protect its interests upon default. The court therefore holds the Debtors are authorized to make direct payments to the FLB which shall not be subject to the Trustee's percentage fee.

The PCA is a legally sophisticated creditor who has been actively involved and represented by competent counsel throughout this case. Although the PCA allowed secured claim is not now extremely large,

the PCA has conditionally agreed to become a funder and to loan the Debtors additional money. When this loan is consummated, the amount of the PCA claim will be substantially increased. The PCA's rights are modified by the Plan and its treatment will be further altered when it makes the contemplated post-confirmation loan. The PCA has agreed to its Plan treatment. It has explicitly consented to receive future direct payments. The PCA has the economic incentive and is willing to monitor future direct payments. It is able to take appropriate action to protect its interests upon default. The court therefore holds the Debtors are authorized to make direct payments to the PCA which shall not be subject to the Trustee's percentage fee.

Ethel Stears is an undersecured creditor who, as an individual, holds a relatively large allowed secured claim. Mrs. Stears' rights have been altered, with her consent, under the Plan. Mrs. Stears testified at the confirmation hearing and supported confirmation of the Plan. She reiterated her explicit consent to receive future direct payments. Mrs. Stears, while not legally sophisticated, is represented by competent counsel who has been actively involved in this case. Mrs. Stears stated that she is willing to monitor future direct payments. If a direct payment is not timely made, she will contact her counsel to protect her rights. The court therefore holds the Debtors are authorized to make direct payments to Ethel Stears which shall not be subject to the Trustee's percentage fee.

Alvin Lammon is an undersecured creditor who holds a relatively small allowed secured claim. Mr. Lammon's allowed secured claim was determined at a contested valuation hearing. Mr. Lammon's rights have been substantially modified by the Plan. He has not consented to his treatment under the Plan. He has not consented to receive future direct payments. Mr. Lammon is a legally unsophisticated individual who, except for the valuation hearing, to the court's knowledge, has not been represented by counsel. It is unknown whether Mr. Lammon has the economic incentive to monitor future direct payments. Given these circumstances, the court believes that Mr. Lammon's distributions must be made through the Trustee. The court therefore holds the Debtors are not authorized to make direct payments to Alvin Lammon. Any future payments to be made on Alvin Lammon's claim shall be paid to the Trustee and the Trustee shall be entitled to receive his statutory percentage fee.

The ASCS holds a relatively large allowed secured claim. The Debtors' Plan does not alter or modify the rights of the ASCS. The ASCS is not impaired. It has not objected to receiving direct payments from the Debtors. The ASCS is legally sophisticated. It will likely be able to monitor future direct payments and enforce its rights upon default. Therefore, the court holds the Debtors are authorized to make direct payments to the ASCS which shall not be subject to the Trustee's percentage fee.

FMCC is a fully secured creditor who has a relatively small allowed claim. FMCC's rights will not be modified by the Plan. It will receive regular monthly payments pursuant to its contract. The FMCC, although legally sophisticated, has not been represented by counsel in connection with this case; it likewise has not consented to receive direct payments from the Debtors. Based upon the record before this court, the Debtors have not convinced the court that direct payments to FMCC are warranted. The court therefore holds that the Debtors shall not be authorized to make direct payments to FMCC. All payments regarding FMCC's allowed secured claim shall be made through the Trustee and be subject to the Trustee's statutory percentage fee.

Deere is a fully secured creditor who holds a relatively substantial allowed claim. The Plan provides that Deere will be paid its allowed secured claim, pursuant to modified terms, over the next five years. Deere has not objected to the Plan. Deere has not explicitly consented to receive direct payments. Deere has not appeared in these proceedings by counsel. The Debt-

ors have not convinced the court that direct payments to Deere are warranted. The court therefore holds that the Debtors are not authorized to make direct payments to Deere. All payments to be made on Deere's allowed secured claim shall be made through the Trustee and the Trustee shall be entitled to receive his statutory percentage fee.

DeKalb is now a lessor of certain irrigation equipment possessed by the Debtors. In accordance with the Plan, DeKalb will transfer title to the leased equipment to the Debtors. DeKalb will become a secured creditor and hold a reduced allowed secured claim. DeKalb's legal rights have been modified with DeKalb's consent. DeKalb has not explicitly consented to receive direct payments. DeKalb has not appeared in this case. Based upon the record before the court, the Debtors have not convinced the court that direct payments to DeKalb are warranted. The court therefore holds direct payments to DeKalb are not authorized. Payment of DeKalb's allowed secured claim shall be made through the Trustee and shall be subject to the Trustee's statutory percentage fee.

Comerica Bank holds a disputed secured claim of approximately $220,000.00. The Debtors and Comerica Bank have agreed to settle the disputed claim, and all other causes of action which may exist by or between them, in return for a cash payment to the bank in the amount of $200,-000.00. The payment is to be directly made within thirty days after confirmation of the Plan. Comerica Bank has been extremely active in this case and has been represented by competent counsel. Although Comerica Bank's legal rights have been modified, it has consented to its Plan treatment. Comerica Bank has explicitly consented to receive the direct payment. Special circumstances exist with regard to the payment of Comerica Bank's modified allowed claim. As stated above, it would be grossly inequitable for the court to require the Debtors to pay a $20,000.00 fee solely as the result of the Trustee receiving the loan proceeds and then immediately disbursing those proceeds to Comerica Bank. The court therefore holds the Debtors are authorized to

make the direct payment to Comerica Bank which shall not be subject to the Trustee's percentage fee.

The Debtors' attorneys have agreed to defer payment of their court-approved attorneys' fees and expenses. The Debtors propose to directly pay their attorneys, without Trustee supervision, from their future income. Payments of the Debtors' attorneys will be subject to court approval. Although this is a close question, the court believes there is no reason to prohibit the requested direct payments of attorneys' fees *provided* that reports regarding all fee payments are filed with the court and served upon the Trustee. The court therefore holds the Debtors are authorized to make direct payments of court-approved attorneys' fees and expenses provided reports of such payments are filed with the court and served upon the Trustee. Such direct payments shall not be subject to the Trustee's percentage fee.

The court has determined that the allowed claims of Alvin Lammon, Ford Motor Credit Corporation, John Deere Company, and DeKalb Leasing Equipment Corporation are not authorized to be paid directly. Pursuant to the court's review of claims filed, those four creditors' allowed secured claims total approximately $118,000.00, exclusive of future interest. The Trustee is entitled to receive the ten percent fee. Therefore, the Trustee will be entitled to receive a fee totaling approximately $11,-800.00 regarding those creditors' payments. The court finds this fee shall be adequate for, and not disproportionate to, the Trustee's efforts and involvement in this case. If the Trustee realizes his maximum compensation with regard to all of his Chapter 12 cases, some excess fees might also be available for the benefit of the United States Trustee system. Therefore, the court finds that an amended plan, which comports with this decision, will likely not be burdensome upon the Trustee.

The court finds the Debtors are making their best effort. 11 U.S.C. § 1225(b)(1) and (2). The required payment of any additional Trustee's statutory percentage fee

must necessarily reduce the aggregate amount available to unsecured creditors by an equal amount. Therefore, regretfully for creditors who hold allowed unsecured claims, the amount available to be disbursed to the class of unsecured creditors under an amended plan will be reduced.

Based upon this decision, confirmation of the Second Amended Plan of Reorganization filed by the Debtors is denied. However, this court will likely confirm a further amended Chapter 12 plan based upon the following conditions:

A. The allowed secured claim of Ford Motor Credit Corporation shall be paid through the Trustee.

B. The allowed secured claim of John Deere Company shall be paid through the Trustee.

C. The allowed secured claim of DeKalb Leasing Equipment Corporation shall be paid through the Trustee.

D. The allowed secured claim of Alvin Lammon shall be paid through the Trustee.

E. The Debtors shall keep accurate disbursement records reflecting all direct payments made to secured creditors and the Debtors' attorneys and that such records will be made available, upon request, to the Trustee and any interested creditors during the life of the plan.

F. Direct payments shall be made to secured creditors by check or by some other method whereby the Debtors can conclusively demonstrate that direct payments were timely made as required by the confirmed plan.

G. The Debtors shall file an annual report, on February 15 of each year, which discloses the amounts of the direct payments made to each secured creditor, the check number, and the date upon which such direct payments were made. In the event that the direct payment is not timely made to a secured creditor, the annual report shall disclose this information. In the event the Debtors fail, neglect or refuse to file the annual report on a timely basis, the Debtors shall be deemed to be in default under the terms of their confirmed plan of reorganization. Upon occurrence of any

such default, a creditor who has not been paid, the Trustee, or any other interested entity, may promptly file a motion with this court to request appropriate relief.

Upon filing of an amended plan of reorganization which comports with this opinion, all creditors and interested persons will be given the opportunity to object to such amended plan. After notice to creditors and interested parties, if no objection is lodged to the amended plan, such amended plan will be confirmed without the necessity of a further formal hearing before this Court. However, if an objection to the confirmation of the amended plan is filed, the court will schedule a hearing to take place regarding any objection as soon as is possible.

An order shall be entered accordingly.